## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HOWARD BROWN, Individually and On Behalf of All Others Similarly Situated,<br><br>                                    Plaintiff,<br><br>                v.<br><br>QUTOUTIAO INC., ERIC SILIANG TAN, LEI LI, JINGBO WANG, XIAOLU ZHU, SHAOQING JIANG, JIANFEI DONG, and OLIVER YUCHENG CHEN,<br><br>                                    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Howard Brown ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Plaintiff's attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, Plaintiff's counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Qutoutiao Inc. ("Qutoutiao" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Qutoutiao; and (c) review of other publicly available information concerning Qutoutiao.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons and entities that: (a) purchased or otherwise acquired Qutoutiao American Depositary Shares ("ADSs") pursuant and/or traceable to the registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's September 2018 initial public offering ("IPO" or the "Offering"); and/or (b) purchased or otherwise acquired Qutoutiao securities between September 14, 2018 and July 15, 2020, inclusive (the "Class Period").  Plaintiff pursues claims against the Defendants under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Qutoutiao offers a mobile application called Qutoutiao (which means "fun headlines" in Chinese) that aggregates articles and short videos from professional media and freelancers and presents customized feeds to users.

3.     On September 14, 2018, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement.  In the IPO, the Company sold 13.8 million ADSs at a price of $7.00 per share.  The Company received proceeds of approximately $85.8

million from the Offering, net of underwriting discounts and commissions.  The proceeds from the IPO were purportedly to be used for expanding and enhancing the Company's content offerings, for product development and technology infrastructure, and for general corporate purposes, including marketing and promotion of its products and branding and potential acquisitions and investments.

4.      On December 10, 2019, Wolfpack Research ("Wolfpack") published a report, alleging, among other things, that the Company had overstated its revenues by recording non-existent advances from advertising customers.  Moreover, the report alleged that Qutoutiao replaced its third-party advertising agent with a related party, thereby bypassing the agent's oversight and allowing the Company to "perpetrate the unmitigated ad fraud that [Wolfpack] observed in [its] sample."

5.      On this news, the Company's ADS price fell $0.12 per share, or approximately 4%, to close at $2.86 per share on December 11, 2019.

6.      On July 15, 2020, hosts of a consumer rights gala stated that Qutoutiao had allowed ads on its platform promoting exaggerated or impossible claims from weight-loss products.  For example, one such ad offered free weight-loss products valued at $14,300 that would help users lose more than 30 pounds a month.

7.      On this news, the Company's ADS price fell $0.85 per share, or approximately 23%, to close at $2.84 per share on July 16, 2020.

8.      On July 17, 2020, Chinese media reported that Qutoutiao's app had been removed from domestic Android app stores.

9.      By the commencement of this action, Qutoutiao's ADSs last closed at $2.42 per share on September 17, 2020, representing a 65.43% decline from the $7.00 per share IPO price.

10.     In the Registration Statement and throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (i) that Qutoutiao replaced its advertising agent with a related party, thereby bypassing third-party oversight of the content and quality of the advertisements; (ii) that the Company placed advertisements on its mobile app for products whose claims could not be substantiated and thus were considered false advertisements under applicable regulations; (iii) that, as a result, the Company would face increasing regulatory scrutiny and reputational harm; (iv) that, as a result, the Company's advertising revenue was reasonably likely to decline; and (v) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

16.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased or otherwise acquired Qutoutiao ADSs pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO and/or Qutoutiao securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant Qutoutiao is incorporated under the laws of the Cayman Islands with its principal executive offices located in Shanghai, China.  Qutoutiao's ADSs trade on the NASDAQ exchange under the symbol "QTT."

18.     Defendant Eric Siliang Tan ("Tan") was, at all relevant times, the Executive Chairman of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.  Tan has served as the Company's Chief Executive Officer ("CEO") since May 20, 2019.

19.     Defendant Lei Li ("Li") was the CEO of the Company until May 20, 2019, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

20.     Defendant Jingbo Wang ("Wang") was the Chief Financial Officer ("CFO") of the Company until January 22, 2020, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

21.     Defendant Xiaolu Zhu ("Zhu") has been the CFO of the Company since January 22, 2020.

22.     Defendants Tan, Li, Wang, and Zhu (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

23.     Defendant Shaoqing Jiang ("Jiang") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

24.     Defendant Jianfei Dong ("Dong") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

25.     Defendant Oliver Yucheng Chen ("Chen") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

26.     Defendants Tan, Li, Wang, Jiang, Dong, and Chen are collectively referred to hereinafter as the "Securities Act Individual Defendants."

27.     Qutoutiao, the Individual Defendants, and the Securities Act Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

28.     Qutoutiao offers a mobile application called Qutoutiao (which means "fun headlines") that aggregates articles and short videos from professional media and freelancers and presents customized feeds to users.

### Qutoutiao's Materially False and/or Misleading Registration Statement and Prospectus

29.     On September 11, 2018, the Company filed its final amendment to the Registration Statement with the SEC on Form F-1/A, which forms part of the Registration Statement.  The Registration Statement was declared effective on September 13, 2018.

30.     On September 14, 2018, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement.  In the IPO, the Company sold 13.8 million ADSs at a price of $7.00 per share.  The Company received proceeds of approximately $85.8 million from the Offering, net of underwriting discounts and commissions.  The proceeds from the IPO were purportedly to be used for expanding and enhancing the Company's content offerings, for product development and technology infrastructure, and for general corporate purposes, including marketing and promotion of its products and branding and potential acquisitions and investments.

31.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

32.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

33.     The Registration Statement touted that the Company's "net revenues have increased rapidly from RMB58.0 million (US$8.8 million) in 2016 to RMB517.1 million (US$78.1 million) in 2017, and further from RMB107.3 million (US$16.2 million) in the six months ended June 30, 2017 to RMB717.8 million (US$108.5 million) in the same period in 2018."[1]  The majority of this revenue was derived from advertising, as the Company stated in the Registration Statement:

> We charge our advertising services mainly on a cost-per-click, or CPC, basis, and in certain circumstances, on a cost-per-thousand-impressions, or CPM, basis.
>
> Baidu, which is our largest customer and operates a third-party advertising platform, contributed 69.9%, 43.7%, 75.8% and 12.1% of our net revenues in 2016 and 2017 and the six months ended June 30, 2017 and 2018, respectively. Baidu also accounted for 92.6%, 59.8% and 30.5% of our accounts receivable as of December 31, 2016 and 2017 and June 30, 2018, respectively. ***To enhance our platform's monetization capabilities, we acquired an advertising agent in February 2018 that operates a programmatic advertising system. We expect this system will allow us to reduce our reliance on third-party advertising platforms such as Baidu. Prior to our acquisition of this advertising agent in February 2018, we engaged such advertising agent to serve as our sales agent in selling our advertising solutions to other second-tier advertising agents and end advertisers.*** In 2017 and the six months ended June 30, 2018, 26.2% and 78.2% of our net revenues, respectively, were generated through this advertising agent. These second-tier advertising agents and end advertisers are our customers as they select our mobile applications to place their advertisement and our performance obligation is to provide the underlying advertising display services to them. We recognize advertising revenue from this advertising agent on a gross basis as clicks are delivered on a CPC basis. We also engage certain other advertising agents in selling our advertising solutions to our advertising customers.
>
> In addition, we collaborate with various third-party advertising platforms to place advertisements on our platform. Under our arrangements with these advertising platforms, these advertising platforms are our customers and our performance obligation is to provide traffic to these advertising platforms. As such, we recognize advertising revenue on the net amount as impressions or clicks are delivered on a CPC or CPM basis. We have started to reduce the utilization of third-party advertising platforms in 2017 and we expect such collaboration to continue to

---

[1] As used herein, "RMB" refers to Chinese Yuan, "DAU" refers to Daily Active User, "MAU" refers to Monthly Active User, and "SAIC" refers to State Administration for Industry and Commerce.

decrease in the future as we further increase direct sales of our advertising solutions. However, certain of these third-party advertising platforms were historically our largest customers and may continue to contribute a significant portion of our net revenues in the near future.

(Emphasis added.)

34.    Accordingly, the Company claimed to "actively monitor the advertisements placed" to ensure compliance with applicable regulations.  Specifically, the Registration Statement stated, in relevant part:

> **Advertisements on our mobile applications may subject us to penalties and other administrative actions.**
>
> Under PRC advertising laws and regulations, we are obligated to monitor the advertising content shown on our mobile applications to ensure that such content is true, accurate and in full compliance with applicable laws and regulations. On April 24, 2015, the Standing Committee of the National People's Congress issued the *Advertisement Law*, which took effect on September 1, 2015, to further strengthen the supervision and management of advertisement services. On July 4, 2016, SAIC issued the *Interim Measures for the Administration of Internet Advertising*, or the New Interim Measures, to further regulate Internet advertising activities. ***Pursuant to these laws and regulations, any advertisement that contains false or misleading information to deceive or mislead consumers shall be deemed false advertising. Furthermore, the Advertisement Law explicitly stipulates detailed requirements for the content of several different kinds of advertisement, including advertisements for medical treatment, pharmaceuticals, medical instruments, health food, alcoholic drinks, education or training, products or services having an expected return on investment, real estate, pesticides, feed and feed additives, and some other agriculture-related advertisement. Also, according to the New Interim Measures, no advertisement of such special products or services which are subject to examination by an advertising examination authority shall be published unless it has passed such examination.*** In addition, an Internet advertisement shall be identifiable and clearly identified as an "advertisement" so that consumers will know that it is an advertisement. The New Interim Measures also provide that Internet advertisement publishers shall verify related supporting documents, check the content of the advertisement and be prohibited from publishing any advertisement with nonconforming content or without all the necessary certification documents. However, for the determination of the truth and accuracy of the advertisements, there are no implementing rules or official interpretations, and such a determination is at the sole discretion of the relevant local branch of the State Administration for Market Regulation, or the SAMR (successor of SAIC and the State Food and Drug Administration), which results in uncertainty in the application of these laws and regulations . . . .

We cannot assure you that all the advertisements shown on our mobile applications are true, accurate, appropriate and in full compliance with applicable laws and regulations. For example, advertisers on our mobile applications, or their agents, may use measures that are designed to evade our monitoring, such as providing inauthentic material that does not match the actual advertisement, or supplying advertising which is superficially compliant but nevertheless is linked to one or more webpages that feature noncompliant advertising content. In addition, our employees responsible for reviewing advertisements may not fully understand the relevant laws and regulations or may be inappropriately influenced by the advertisers. In each case, we may still be held responsible for noncompliant advertising content. *We include clauses in most of our advertising contracts requiring that all advertising content provided by advertising customers must comply with relevant laws and regulations. Pursuant to the contracts between us and the relevant advertising agents or advertising customers, they are liable for all damages to us caused by their breach of such representations. However, there can be no assurance that we will be able to successfully enforce our contractual rights.*

Violation of these laws and regulations may subject us to penalties, including fines, confiscation of our advertising income, orders to cease dissemination of the advertisements and orders to eliminate the effect of illegal advertisement. If an illegal advertisement featured on our mobile applications were to have excessive negative effects, our brand and reputation may be harmed, and PRC governmental authorities may pursue more severe penalties and administrative actions against us. PRC governmental authorities may even force us to terminate our advertising operation or revoke our licenses in circumstances involving serious violations. Such penalties may have a material and adverse effect on our business, results of operations and financial condition.

(Last two emphases added.)  Plainly, this risk warning was a generic, catch-all provision that was not tailored to Qutoutiao's actual known risks with respect to then-known deficiencies in its advertising compliance and related policies.

35.    The Registration Statement also described Qutoutiao's monitoring practices, stating:

Our advertising technology aims to maximize our revenue potential by rewarding the more relevant advertisement with a more prominent position, despite the potentially lower price bid of such advertisement. *We actively monitor the advertisements placed to help ensure their relevance.*

Customers for our programmatic advertising system are comprised of advertising agents and end advertisers. We have our own sales personnel who are responsible

to support and monitor the performances of advertising agents and to attract advertising customers to use our programmatic advertising system directly. We enter into standard agreements with advertising agents generally for a term of one year. Our advertising agents are responsible for identifying end advertisers, confirming payments and setting up accounts on our programmatic advertising system for advertising customers. *We provide ongoing training to advertising agents to familiarize them with the functionalities and capabilities of our programmatic advertising system. These advertising agents are responsible for collecting and submitting the relevant documentation and licenses from advertising customers for our approval to open an account on our programmatic advertising system*, and are also liable for any infringement of third-party rights or violation of regulatory requirements caused by advertisements placed by their end advertisers.

(Emphases added.)

36.    Additionally, the Registration Statement purported to warn that a decline in advertising revenue would adversely affect the Company:

*We generate a substantial majority of our revenues from advertising. A decline in our advertising revenue could harm our business.*

We generated almost all of our revenues from advertising services in 2016, 2017, and the six months ended June 30, 2018. When we first commenced our business, we collaborated with various third-party advertising platforms to place advertisements on our mobile applications. *To enhance our platform's monetization capabilities, we acquired an advertising agent in February 2018 that operates a programmatic advertising system. This system will serve to power our advertising solutions while reducing the use of third-party advertising platforms.* In 2017 and the six months ended June 30, 2018, 26.2% and 78.2%, respectively, of our net revenues were generated through this advertising agent. We have limited experience in operating the programmatic advertising system and in acquiring our own advertising agents and advertising customers. We may not be able to establish our own sales personnel to effectively and efficiently acquire and retain advertising agents and advertising customers. The effectiveness of our programmatic advertising system may not perform as expected and achieve widespread acceptance by advertising customers.

Our advertising customers for our programmatic advertising system are comprised of advertising agents and end advertisers . . . . If we fail to retain existing advertising customers or ensure that their advertising spend with us remains at similar or increased levels or attract new advertising customers to advertise on our platform, our business, results of operations and financial condition may be materially and adversely affected.

(Second emphasis added.)  Plainly, this risk warning, too, was a generic, catch-all provision that was not tailored to Qutoutiao's actual known risks with respect to then-known deficiencies in its advertising compliance and related policies.

37.    The statements contained in ¶¶ 33-36 were materially false and misleading because the Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.  Specifically, the Registration Statement was false and/or misleading and/or failed to disclose: (i) that Qutoutiao replaced its advertising agent with a related party, thereby bypassing third-party oversight of the content and quality of the advertisements; (ii) that the Company placed advertisements on its mobile app for products whose claims could not be substantiated and thus were considered false advertisements under applicable regulations; (iii) that, as a result, the Company would face increasing regulatory scrutiny and reputational harm; (iv) that, as a result, the Company's advertising revenue was reasonably likely to decline; and (v) that, as a result, the Registration Statement was materially false and/or misleading and failed to state information required to be stated therein.

**Materially False and Misleading Statements Issued During the Class Period**

38.    The Class Period begins on September 14, 2018, when the Company's ADSs began publicly trading on the NASDAQ exchange pursuant to the false or misleading statements or omissions in Registration Statement.

39.    On November 12, 2018, Qutoutiao announced its third quarter 2018 financial results in a press release that stated, in relevant part:

**Third Quarter 2018 Highlights**

- **Average DAUs** reached 21.3 million, representing an increase of 229.0% from 6.5 million in the third quarter of 2017 and an increase of 69.1% from 12.6 million in the previous quarter.

- **Average daily time spent per DAU** reached 55.9 minutes, representing an increase of 64.4% from 34.0 minutes in the third quarter of 2017 and an increase of 18.9% from 47.0 minutes in the previous quarter.

- **Net revenues increased** by 520.3% to RMB977.3 million (US$142.3 million) from RMB157.6 million in the third quarter of 2017, and by 103.0% from RMB481.4 million in the previous quarter.

* * *

*Advertising revenues* were RMB896.5 million (US$130.5 million) in the third quarter of 2018, an increase of 472.3% from RMB156.7 million in the same period of 2017, primarily due to increases in the Company's average DAUs, average daily time spent per DAU and the Company's ability to monetize user traffic.

40.    On March 5, 2019, Qutoutiao announced its fourth quarter and full year 2018

financial results in a press release that stated, in relevant part:

**Fourth Quarter 2018 Highlights**

- **Average MAUs** reached 93.8 million, representing an increase of 286.0% from 24.3 million in the fourth quarter of 2017 and an increase of 43.8% from 65.2 million in the previous quarter.

- **Average DAUs** reached 30.9 million, representing an increase of 224.2% from 9.5 million in the fourth quarter of 2017 and an increase of 45.2% from 21.3 million in the previous quarter.

- **Average daily time spent per DAU** reached 63.0 minutes, representing an increase of 96.3% from 32.1 minutes in the fourth quarter of 2017 and an increase of 12.7% from 55.9 minutes in the previous quarter.

- **Net revenues** increased 426.1% year-over-year to RMB1,327.0 million (US$193.0 million), exceeding the high end of the Company's guided range at RMB1,250.0 million.

* * *

*Advertising and marketing revenues* were RMB1,247.9 million (US$181.5 million) in the fourth quarter of 2018, an increase of 399.4% from RMB249.9 million in the same period of 2017, primarily due to increases in the Company's user base, time spent and ability to monetize user traffic.

41.     On April 11, 2019, Qutoutiao filed its annual report on Form 20-F for the period ended December 31, 2018, affirming the previously reported financial results.   Regarding advertising content, the report stated, in relevant part:

> ***Advertisements on our mobile applications may subject us to penalties and other administrative actions.***
>
> Under PRC advertising laws and regulations, we are obligated to monitor the advertising content shown on our mobile applications to ensure that such content is true, accurate and in full compliance with applicable laws and regulations . . . . Pursuant to these laws and regulations, any advertisement that contains false or misleading information to deceive or mislead consumers shall be deemed false advertising. ***Furthermore, the Advertisement Law explicitly stipulates detailed requirements for the content of several different kinds of advertisement, including advertisements for medical treatment, pharmaceuticals, medical instruments, health food, alcoholic drinks, education or training, products or services having an expected return on investment, real estate, pesticides, feed and feed additives, and some other agriculture-related advertisement.*** Also, according to the New Interim Measures, no advertisement of such special products or services which are subject to examination by an advertising examination authority shall be published unless it has passed such examination . . . .
>
> We cannot assure you that all the advertisements shown on our mobile applications are true, accurate, appropriate and in full compliance with applicable laws and regulations. For example, advertisers on our mobile applications, or their agents, may use measures that are designed to evade our monitoring, such as providing inauthentic material that does not match the actual advertisement, or supplying advertising which is superficially compliant but nevertheless is linked to one or more webpages that feature noncompliant advertising content. In addition, our employees responsible for reviewing advertisements may not fully understand the relevant laws and regulations or may be inappropriately influenced by the advertisers. In each case, we may still be held responsible for noncompliant advertising content. We include clauses in most of our advertising contracts requiring that all advertising content provided by advertising customers must comply with relevant laws and regulations. Pursuant to the contracts between us and the relevant advertising agents or advertising customers, they are liable for all damages to us caused by their breach of such representations. However, there can be no assurance that we will be able to successfully enforce our contractual rights.

(Second emphasis added.)  Plainly, this risk warning was a generic, catch-all provision that was not tailored to Qutoutiao's actual known risks with respect to then-known deficiencies in its advertising compliance and related policies.

42.    On May 20, 2019, Qutoutiao reported its first quarter 2019 financial results in a press release that stated, in relevant part:

**First Quarter 2019 Highlights**

- **Combined average MAUs** reached 111.4 million, representing an increase of 297.4% from 28.0 million in the first quarter of 2018 and an increase of 18.7% from 93.8 million in the previous quarter.

- **Combined average DAUs** reached 37.5 million, representing an increase of 231.5% from 11.3 million in the first quarter of 2018 and an increase of 21.4% from 30.9 million in the previous quarter.

- **Average daily time spent per DAU** reached 62.1 minutes, representing an increase of 91.1% from 32.5 minutes in the first quarter of 2018 and generally flat quarter-over-quarter.

- **Net revenues** increased 373.3% year-over-year to RMB1,118.8 million (US$166.7 million), within the Company's guided range between RMB1,100.0 million and RMB1,120 million.

* * *

*Advertising and marketing revenues* were RMB1,087.2 million (US$162.0 million) in the first quarter of 2019, a significant increase of 371.3% from RMB230.7 million in the first quarter of 2018, primarily due to increases in the Company's user base, time spent and ability to monetize user traffic.

43.    On September 4, 2019, Qutoutiao reported its second quarter 2019 financial results in a press release that stated, in relevant part:

**Second Quarter 2019 Highlights**

- **Combined average MAUs** reached 119.3 million, representing an increase of 250.2% from 34.1 million in the second quarter of 2018, compared to 111.4 million in the previous quarter.

14

- **Combined average DAUs** reached 38.7 million, representing an increase of 207.6% from 12.6 million in the second quarter of 2018, compared to 37.5 million in the previous quarter.

- **Average daily time spent per DAU** was 60.0 minutes, representing an increase of 27.5% from 47.0 minutes in the second quarter of 2018, compared to 62.1 minutes in the previous quarter.

- **Net revenues** increased 187.9% year-over-year to RMB1,385.9 million (US$201.9 million), within the Company's guided range between RMB1,380 million and RMB1,420 million.

* * *

*Advertising and marketing revenues* were RMB1,358.0 million (US$197.8 million) in the second quarter of 2019, a significant increase of 209.2% from RMB439.2 million in the second quarter of 2018, primarily due to increases in the Company's user base, time spent and ability to monetize user traffic.

44.     On December 3, 2019, Qutoutiao reported its third quarter 2019 financial results in

a press release that stated, in relevant part:

**Third Quarter 2019 Highlights**

- Combined average MAUs[] reached 133.9 million, representing an increase of 105.3% from 65.2 million in the third quarter of 2018, compared to 119.3 million in the previous quarter.
- Combined average DAUs[] reached 42.1 million, representing an increase of 97.7% from 21.3 million in the third quarter of 2018, compared to 38.7 million in the previous quarter.
- Average daily time spent per DAU was 61.3 minutes, compared to 55.9 minutes in the third quarter of 2018 and 60.0 minutes in the previous quarter.
- Net revenues increased 44.0% year-over-year to RMB1,406.9 million (US$196.8 million), compared to RMB1,385.9 million in the previous quarter, and were above the Company's guidance.

* * *

*Advertising and marketing revenues* were RMB1,381.6 million (US$193.3 million) in the third quarter of 2019, an increase of 54.1% from RMB896.5 million in the third quarter of 2018, primarily due to increases in the Company's user base, time spent and ability to monetize user traffic, and, to a lesser extent, the launch of our new integrated and customized marketing solution services to our customers.

45.    The above statements identified in ¶¶ 39-44 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (i) that Qutoutiao replaced its advertising agent with a related party, thereby bypassing third-party oversight of the content and quality of the advertisements; (ii) that the Company placed advertisements on its mobile app for products whose claims could not be substantiated and thus were considered false advertisements under applicable regulations; (iii) that, as a result, the Company would face increasing regulatory scrutiny and reputational harm; (iv) that, as a result, the Company's advertising revenue was reasonably likely to decline; and (v) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

**The Truth Begins to Emerge**

46.    The truth began to emerge on December 10, 2019, when Wolfpack published a report entitled "QTT: Fake Revenue, Non-Existent Cash, Undisclosed Related Parties."  The report summarized its findings as follows:

- Our analysis and on the ground due diligence indicate that **~74% of QTT's 2018 revenues are fake and ~78% of its current cash balance is non-existent.**

- In its SEC filings, QTT claims revenues of ¥3.02 billion in 2018. We pulled the 2018 SAIC filings for all of QTT's subsidiaries and affiliated entities and found only ¥2.4 billion in aggregate revenue. ***After pulling detailed credit reports of QTT's main operating VIE and its in-house "advertising agent," we conclude that QTT's real revenues only totaled approximately ¥798 million in 2018.***

- We believe QTT generated at least ¥1.29 billion of additional fake revenues in 2018 by recording non-existent "advances from advertising customers" on the books of its in-house advertising agent, Shanghai Dianguan, then paying them out to QTT's main operating VIE, Shanghai Jifen, as prepaid

expenses. In doing so, QTT inflated the financials of both Jifen and Dianguan without any cash actually changing hands between the two.

- SAIC filings and credit reports indicate that fraudulent accounting artificially inflated Dianguan's assets by ¥1.29 billion, or 1,140%. The vast majority of what Dianguan claims to be advances were then shifted to Jifen, enabling Jifen to overstate its 2018 SAIC revenue by at least ¥1.29 billion.

- We believe these non-cash, revenue inflating accounting entries could have been hidden in QTT's 2018 20-F, when the company was flush with cash from its $96.6 million (¥663.2 million) September 2018 IPO, in addition to the more than $300 million (¥1 billion) the company raised via preferred stock issuance in the 12 months prior to its IPO.

* * *

- QTT does not provide quarterly cash flow statements, but by our calculation the company's cash flow from operations was a staggering **negative ¥1.75 billion** in the first three quarters of 2019. After adding in QTT's ¥1.29 billion of what we believe to be non-existent revenues from 2018, it becomes clear to us that the ¥3.42 billion QTT has raised since its IPO last September is barely enough to keep the company solvent. We believe QTT only has approximately ¥459 million of cash left in the bank – at its current burn rate, this is barely enough to keep the lights on through the end of December.

(Emphasis added.)

47.    Specifically, the Wolfpack report alleged that Qutoutiao replaced its third-party advertising agent with a related party, thereby bypassing the agent's oversight and allowing the Company to "perpetrate the unmitigated ad fraud that [Wolfpack] observed in [its] sample." The report stated, in relevant part:

When QTT initially launched its business in 2016, it collaborated with various third-party advertising agents/platforms to place ads on its mobile applications. Baidu was QTT's primary advertising agent, accounting for 69.9% and 43.7% of QTT's net revenues in 2016 and 2017, respectively.

***With a well-known company like Baidu managing the majority of QTT's advertising traffic, there was an independent third-party serving as a gatekeeper for the advertisements placed on QTT's apps. QTT had little control over what ads ran on its platform when they were placed by and through third-party***

*advertising agents like Baidu.* QTT terminated its agreements with "other third-party advertising agents" on December 31, 2017.

Then, in February 2018, QTT acquired its own advertising agent, Shanghai Dianguan Network Technology Co., Ltd. ("Dianguan"). Based on SAIC filings, it appears that QTT was its only customer prior to the acquisition and Dianguan was formed with zero invested capital just over four months prior to the acquisition and had no registered intellectual property until after the acquisition was made.

* * *

QTT specifically said the motivation for this acquisition was to "*reduce [QTT's] reliance on third-party advertising platforms such as Baidu.*" Why would QTT want to "reduce its reliance" on Baidu's advertising services just before its IPO?

Baidu had full control over the distribution of advertising traffic on their clients' platforms, and *Baidu uses algorithms which ensure legal compliance and provide oversight of their clients' advertising business, per Baidu's registration agreement*. And Baidu, like any other independent advertising agent, uses industry standard restrictions on "induced clicks":

[Image omitted]

*We believe QTT needed these restrictions removed in order to perpetrate the unmitigated ad fraud that we observed in our sample.* The Dianguan acquisition appears to have served its purpose – Dianguan accounted for 78.2% of QTT's revenue in the first six months of 2018, while Baidu only accounted for 4.2% of QTT's revenue in 2018, a massive drop from its 43.7% contribution in the prior year.

While Dianguan's numbers appear to make up for the loss of Baidu revenue, there is a big catch. As we explained in Section 1, national credit reports for Dianguan differ from its SAIC filings. In our opinion, this alone is evidence that Dianguan is a fraudulent corporate entity.

*With Dianguan in place and third-party oversight removed from QTT's advertising platform, QTT was free to do whatever it wanted with its advertisements.* Our analysis indicated that QTT wanted to direct ad traffic to Eric Tan's private companies. In doing so, Tan appears to be using QTT to inflate the user metrics of his other ventures.

* * *

QTT acquired Dianguan to replace Baidu as its principal advertising agent. However, we found that Dianguan does not sell ads nor does it work with advertising clients to prepare ads. Outside ads are placed by outside agents onto

QTT's apps. These two outside agents do not supervise and legitimately direct ad-traffic as Baidu did. The two agents merely deal with customers, and feed their ads directly onto QTT platforms.

So, to all evidence we found, Dianguan exists only as a name and a financial placeholder, not a real-world entity. The acquisition of Dianguan eliminated the ad-traffic supervision of Baidu, but did not replace any other function Baidu performed. QTT uses outside ad agents to sell, prepare and place ads for outside customers. These outside agents do not provide control over related-party ad traffic, and they cannot prevent induced clicks or other abuses the way that Baidu did. Dianguan appears to serve only as a pass-through to prevent full scrutiny of QTT's very limited amount of real advertising revenue.

(Emphases added; footnotes omitted.)

48.    On this news, the Company's ADS price fell $0.12 per share, or approximately 4%, to close at $2.86 per share on December 11, 2019.  Despite this decline in Qutoutiao's ADS price, the Company's securities continued to trade at artificially inflated prices throughout the remainder of the Class Period as a result of Defendants' continued misstatements and omissions.

49.    For example, on December 27, 2019, Qutoutiao issued a response, denying many of the allegations in the Wolfpack report.  Specifically, as to the acquisition of Dianguan and its operations, the Company stated, in relevant part:

**1. Allegation that the Vast Majority of Qutoutiao's Revenue and Cash Are Non-existent.**

**The Report's claim that our revenues are fake is due to a lack of understanding of our business and accounting standards.**

**<u>1) Dianguan plays a vital role in Qutoutiao's business</u>**

Dianguan creates value for Qutoutiao through its cooperations with our other subsidiaries that operate our various applications. Take Shanghai Jifen, which primarily engages in the operation of our Qutoutiao mobile application, as an example. In this cooperative relationship, Dianguan serves both as an agent and an in-house advertising platform for Jifen.

As an agent, Dianguan serves as the Jifen's sales agent in selling Jifen's advertising solutions to second-tier advertising agents, the end advertisers are the customers of Jifen as they specifically select Qutoutiao to display its advertisement and the

performance obligation of Jifen is to provide the underlying advertising display services. Dianguan collects advances from end customers, usually through second-tier agents. Advances are recognized as revenues when advertisement displays and/or clicks are delivered on Qutoutiao.

As an in-house advertising platform, Dianguan leverages its technology to provide a bidding system for placing advertisements on Qutoutiao.

The differences between the SAIC report and the credit report for Dianguan are mainly attributable to different presentation methods. In the SAIC report, we presented revenues and costs on a net basis, while in the credit report we were suggested to present on a gross basis. The net profit and net asset (total equity) in the two presentations had no material differences with each other.

The consolidated financial statements for Qutoutiao are prepared in accordance with US GAAP. Dianguan and Jifen are both wholly owned subsidiaries of Qutoutiao and any internal transactions between the two are fully eliminated upon consolidation. It is incorrect to simply sum up the accounts of subsidiaries on a standalone basis and draw comparisons with the consolidated statements.

* * *

**2. Allegation that Qutoutiao Removed the Gatekeeper with Dianguan Acquisition**

**1)  Our rationale to acquire Dianguan**

When Qutoutiao first commenced on its business, due to our limited operating history and human resources, we collaborated with various third-party advertising platforms to efficiently and rapidly fill advertisement space on our mobile applications. Thus, we historically generated a significant portion of our net revenues from a limited number of third-party advertising platforms, for example, Baidu used to be our largest customer, it contributed 69.9% and 43.7% of our net revenues in 2016 and 2017, respectively. However, such concentration risk may cause significant fluctuations of our operational results in that any adverse change in our relationship with these advertising platforms, including our arrangements with them, or a decrease in the amount or quality of the advertisements placed by these platforms on our mobile applications may materially and adversely affect our results of operations.

As our business grew rapidly and substantially, it made perfect sense to start building our own distribution capabilities, i.e., an in-house advertising platform. The benefit of owning an in-house advertising platform is not only enhanced monetization efficiency as we can improve advertising technology for better matching of supply and demand which results in higher average revenue per user

("ARPU"), it also allows our business to become independent and obtain long-term viability.

This was why in February 2018 we made the decision to acquire Dianguan which then became our in-house advertising platform. At the time of this acquisition, Dianguan had built up a good technical base as it owned several intellectual properties, which were valuable assets for us to further develop our proprietary advertising platform related technology. The acquisition decision was made after thorough due diligence, the purchase consideration of RMB15 million was supported by a valuation report. This acquisition enabled our in-house advertising platform to grow from zero to one, and also ensured the rapid growth of our advertising business. Post-acquisition, Dianguan was fully integrated with our internal resources including other subsidiaries, which, after continuous investments, developed into our proprietary programmatic advertising system. Dianguan has become more technologically advanced since the completion of the acquisition, and it has been leveraging its advantages in technology and algorithm to act as an agent for other media platforms in China, which has enriched our revenue mix. The fact that the bulk of our revenues are now generated by Dianguan with ARPU at reasonable levels is evidence that we have made a successful acquisition.

***Therefore, the reduction of Baidu's revenue share and the increase of Dianguan's revenue share has nothing to do with 'removing a gatekeeper'.*** It is a natural transition and a very positive and healthy development for a young business as it successfully grew and secured a position in a highly competitive industry.

(Emphasis added.)

50.    The Company also disputed the Wolfpack report allegation that its advertising revenue is traceable to undisclosed related parties. Specifically, Qutoutiao stated, in relevant part:

### 1) The claim is invalid as the Report relies on inadequate sample size that lacks statistical significance

The total number of advertisements placed on Qutoutiao's platform per day exceeds 2,000,000,000. Therefore, analyzing 50,000[] advertisements (i.e., only 0.0025% of total) concentrated in a very confined period (i.e., four hours on September 12, 2019) on Qutoutiao's platform would lead to skewed results, especially considering that behind the very limited sample size is a very limited number of test phones that are not capable of replicating the diverse behaviours exhibited by our 42 million daily active users.

As our programmatic advertising system considers a wide range of parameters to determine which advertisement to display, including price bid, predicted click-

through rate and content relevance, any results generated by a miniscule sample through a tiny group of fake users (i.e., test phones) could inevitably be skewed. That is to say, as the test phones probably have some identical or similar characteristics, when these test phones frequently send requests to our advertising system in a short period of time, it could respond to these "fake requests" by recommending similar contents, so that the advertisements received by these fake users are concentrated in a specific type, which cannot represent the actual overall situation.

51.     In response, on January 17, 2020, Wolfpack issued a second report to point out that the Company's explanation was vague and failed to address the major concerns raised by the first report.  Specifically, in a report entitled "QTT's Top 12 Lies and Omissions for the New Year," Wolfpack stated:

1. QTT has failed to explain why its reported revenues in China are significantly lower than those they reported to US investors.

2. QTT has provided no proof of its cash and short-term investments balance, and we have found additional reasons for concern. Namely, missing interest income in 3Q19.

3. QTT has failed to address the additional RMB 1.61 billion in customer advances reported by its Chinese subsidiaries that are absent from its SEC filings.

4. QTT's attempt to blame the inconsistencies in Dianguan's filings in China on gross vs. net revenue presentation only make its situation worse.

5. QTT's attempt to explain its rationale for the Dianguan acquisition highlight the absurdity of its story.

6. Dianguan's website, which QTT is apparently so proud of, is far less functional and looks less professional than the websites of the agents QTT claimed to do little-to-no business with. In fact, yesterday the "contact us" button was entirely removed from Dianguan's website.

7. In our view, QTT has continued to deceive investors with regards to the scope, nature and quantity of its related party transactions.

8. QTT's explanation of the economics of its "loyalty program" only included the "user engagement" portion of its loyalty program expenses, which our analysis of QTT's filings shows, accounts for less than half of its total loyalty program expenses.

9. QTT's disclosures regarding insider sales are welcome, but QTT's reluctance to disclose the current holdings of its Insiders and Principal Shareholders raises serious questions.

10. QTT has accused us of being dishonest regarding its numerous lawsuits, yet QTT has not disclosed the fact that RMB 86 million of its bank accounts were frozen by a Chinese court on December 23, 2019.

11. QTT has not denied the accuracy of the ad distribution in our sample. Instead, QTT used a series of qualified assumptions to imagine a scenario that could create a skewed distribution of ad traffic on its platform.

12. QTT has not denied the serious security issues that HybridAnalysis found in QTT's software.

* * *

It takes little more than common sense to understand that QTT's claims that it replaced Baidu with Dianguan in order to improve its advertising technology or the efficiency of its advertising platform are false. It remains clear to us that QTT wanted to build its own advertising platform in order to remove Baidu's oversight of its advertising traffic.

52.    On March 18, 2020, Qutoutiao reported its fourth quarter and full year 2019 financial results in a press release that stated, in relevant part:

**Fourth Quarter 2019 Highlights**

- **Combined average MAUs** reached 137.9 million, representing an increase of 46.9% from 93.8 million in the fourth quarter of 2018, compared to 133.9 million in the previous quarter.

- **Combined average DAUs** reached 45.7 million, representing an increase of 47.8% from 30.9 million in the fourth quarter of 2018, compared to 42.1 million in the previous quarter.

- **Average daily time spent per DAU** was 59.4 minutes, compared to 63.0 minutes in the fourth quarter of 2018 and 61.3 minutes in the previous quarter.

- **Net revenues** increased 25.0% year-over-year to RMB1,658.4 million (US$238.2 million), compared to RMB1,406.9 million in the previous quarter, and were above the high end of the Company's guided range.

* * *

*Advertising and marketing revenues* were RMB1,588.5 million (US$228.2 million) in the fourth quarter of 2019, an increase of 27.3% from RMB1,247.9 million in the fourth quarter of 2018, primarily due to increases in the Company's user base and ability to monetize user traffic.

53.    On April 23, 2020, Qutoutiao filed its annual report on Form 20-F with the SEC for the period ended December 31, 2019, affirming the previously reported financial results. Regarding advertising content, the Company stated, in relevant part:

> ***Advertisements on our mobile applications may subject us to penalties and other administrative actions.***
>
> Under PRC advertising laws and regulations, we are obligated to monitor the advertising content shown on our mobile applications to ensure that such content is true, accurate and in full compliance with applicable laws and regulations . . . . Pursuant to these laws and regulations, any advertisement that contains false or misleading information to deceive or mislead consumers shall be deemed false advertising. Furthermore, the Advertisement Law explicitly stipulates detailed requirements for the content of several different kinds of advertisement, including advertisements for medical treatment, pharmaceuticals, medical instruments, health food, alcoholic drinks, education or training, products or services having an expected return on investment, real estate, pesticides, feed and feed additives, and some other agriculture-related advertisement. Also, according to the New Interim Measures, no advertisement of such special products or services which are subject to examination by an advertising examination authority shall be published unless it has passed such examination . . . .
>
> We cannot assure you that all the advertisements shown on our mobile applications are true, accurate, appropriate and in full compliance with applicable laws and regulations. For example, advertisers on our mobile applications, or their agents, may use measures that are designed to evade our monitoring, such as providing inauthentic material that does not match the actual advertisement, or supplying advertising which is superficially compliant but nevertheless is linked to one or more webpages that feature noncompliant advertising content. In addition, our employees responsible for reviewing advertisements may not fully understand the relevant laws and regulations or may be inappropriately influenced by the advertisers. In each case, we may still be held responsible for noncompliant advertising content. We include clauses in most of our advertising contracts requiring that all advertising content provided by advertising customers must comply with relevant laws and regulations. Pursuant to the contracts between us and the relevant advertising agents or advertising customers, they are liable for all damages to us caused by their breach of such representations. However, there can be no assurance that we will be able to successfully enforce our contractual rights.

Plainly, this risk warning was a generic, catch-all provision that was not tailored to Qutoutiao's actual known risks with respect to then-known deficiencies in its advertising compliance and related policies.

54.    On June 4, 2020, Qutoutiao reported its first quarter 2020 financial results in a press release that stated, in relevant part:

**First Quarter 2020 Highlights**

- **Combined average MAUs** were 138.3 million, representing an increase of 24.2% from 111.4 million in the first quarter of 2019, compared to 137.9 million in the previous quarter.

- **Combined average DAUs** were 45.6 million, representing an increase of 21.5% from 37.5 million in the first quarter of 2019, compared to 45.7 million in the previous quarter.

- **Average daily time spent per DAU** was 62.4 minutes, compared to 62.1 minutes in the first quarter of 2019 and 59.4 minutes in the previous quarter.

- **Net revenues** increased 26.2% year-over-year to RMB1,411.8 million (US$199.4 million), within the Company's guided range of RMB1,400 million and RMB1,420 million.

\* \* \*

*Advertising and marketing revenues* were RMB 1,364.0 million (US$192.6 million) in the first quarter of 2020, an increase of 25.5% from RMB1,087.2 million in the first quarter of 2019, primarily due to increases in the Company's user base, time spent and ability to monetize user traffic.

55.    The above statements identified in ¶¶ 49-50 and 52-54 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (i) that Qutoutiao replaced its advertising agent with a related party, thereby bypassing third-party oversight of the content and quality of the advertisements; (ii) that the Company placed advertisements on its mobile app for products whose claims could not be substantiated and thus were considered false advertisements under applicable regulations; (iii) that, as a result, the Company would face

increasing regulatory scrutiny and reputational harm; (iv) that, as a result, the Company's advertising revenue was reasonably likely to decline; and (v) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

## **The Truth Fully Emerges**

56.     On July 15, 2020, hosts of a consumer rights gala stated that Qutoutiao had allowed ads on its platform promoting exaggerated or impossible claims from weight-loss products.  For example, one such ad offered free weight-loss products valued at $14,300 that would help users lose more than 30 pounds a month.  An article by *Capital Watch*, entitled "No so Fun Headline for Qutoutiao Drives Down Stock," explained:

> An investigative journalist fabricated a weight loss product without providing the relevant official qualification certificate; the advertisement can be published through Qutoutiao's authorized agent. Fake transaction notifications pumped out on the ad page as if someone in a certain area bought the weight loss product a few minutes ago. The "3.15 Consumer Rights Gala", hosted by the state-run CCTV, reported that Qutoutiao published advertisements of a candy that falsely claimed the effect of weight loss or vasodilator-like Sildenafil.

> In addition, advertisements for "making money while playing mobile phones" also frequently appear on Qutoutiao's platform, but [they] turned out to be are [*sic*] illegal lottery ticket sales.

> The Shanghai-based mobile content operator apologized for the misleading advertisements and said the company has set up a special committee on advertisement governance and is conducting an investigation of the ads on the platform.

> "Once relevant issues are found, it is resolutely and strictly investigated and banned," Qutoutiao said in a statement on Thursday.

57.     On this news, the Company's ADS price fell $0.85 per share, or approximately 23%, to close at $2.84 per share on July 16, 2020.

58.     On July 17, 2020, Chinese media reported that Qutoutiao's app had been removed from domestic Android app stores.

59.    By the commencement of this action, Qutoutiao's ADSs last closed at $2.42 per share on September 17, 2020, representing a 65.43% decline from the $7.00 per share IPO price.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

60.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired: (a) Qutoutiao ADSs issued in connection with the Company's IPO; and/or (b) Qutoutiao securities during the Class Period; and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

61.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Qutoutiao's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Qutoutiao ADSs were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Qutoutiao or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

62.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

63.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

64.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Qutoutiao; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

65.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

66.    The market for Qutoutiao's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements, and/or failures to disclose, alleged herein, Qutoutiao's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Qutoutiao's securities relying upon the integrity of the market price of the Company's securities and market information relating to Qutoutiao, and have been damaged thereby.

67.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Qutoutiao's securities, by publicly issuing false and/or misleading statements

28

and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Qutoutiao's business, operations, and prospects as alleged herein.

68.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Qutoutiao's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

69.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

70.     During the Class Period, Plaintiff and the Class purchased Qutoutiao's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

71.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Qutoutiao, their control over, and/or receipt and/or modification of Qutoutiao's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Qutoutiao, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

72.     The market for Qutoutiao's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Qutoutiao's securities traded at artificially inflated prices during the Class Period. On September 14, 2018, the Company's share price closed at a Class Period high of $15.97 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Qutoutiao's securities and market information relating to Qutoutiao, and have been damaged thereby.

73.     During the Class Period, the artificial inflation of Qutoutiao's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading

statements about Qutoutiao's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Qutoutiao and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

74.    At all relevant times, the market for Qutoutiao's securities was an efficient market for the following reasons, among others:

(a)    Qutoutiao shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Qutoutiao filed periodic public reports with the SEC and/or the NASDAQ;

(c)    Qutoutiao regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Qutoutiao was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

75.    As a result of the foregoing, the market for Qutoutiao's securities promptly digested current information regarding Qutoutiao from all publicly available sources and reflected such

information in Qutoutiao's share price.  Under these circumstances, all purchasers of Qutoutiao's securities during the Class Period suffered similar injury through their purchase of Qutoutiao's securities at artificially inflated prices and a presumption of reliance applies.

76.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

77.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker

had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Qutoutiao who knew that the statement was false when made.

## COUNT I

### (Violations of Section 11 of the Securities Act Against Qutoutiao and the Securities Act Individual Defendants)

78.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

79.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Qutoutiao and the Securities Act Individual Defendants.

80.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

81.     Qutoutiao is the registrant for the IPO.  Qutoutiao and the Securities Act Individual Defendants were responsible for the contents and dissemination of the Registration Statement.

82.     As issuer of the ADSs in the IPO, Qutoutiao is strictly liable to Plaintiff and the Class for the misstatements and omissions.

83.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

84.     By reasons of the conduct herein alleged, each of Qutoutiao and the Securities Act Individual Defendants violated, and/or controlled a person who violated Section 11 of the Securities Act.

85.     Plaintiff acquired Qutoutiao ADSs pursuant and/or traceable to the Registration Statement for the IPO.

86.     Plaintiff and the Class have sustained damages.  The value of Qutoutiao ADSs has declined substantially subsequent to and because of the Defendants' violations.

## COUNT II

### (Violations of Section 15 of the Securities Act Against the Securities Act Individual Defendants)

87.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

88.     This Count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class.

89.     The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Qutoutiao within the meaning of Section 15 of the Securities Act.  The Securities Act Individual Defendants had the power and influence and exercised the same to cause Qutoutiao to engage in the acts described herein.

90.     The Securities Act Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

91.     By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## COUNT III

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Qutoutiao and the Individual Defendants)**

92.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

93.     During the Class Period, the Company and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Qutoutiao's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Company and the Individual Defendants, and each of them, took the actions set forth herein.

94.     The Company and the Individual Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Qutoutiao's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  The Company and the Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

95.     The Company and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Qutoutiao's financial well-being and prospects, as specified herein.

96.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Qutoutiao's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Qutoutiao and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

97.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

98.     The Company and the Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless

disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Qutoutiao's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by the Company's and the Individual Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, these defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

99.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Qutoutiao's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Company and the Individual Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Company and the Individual Defendants, but not disclosed in public statements by these defendants during the Class Period, Plaintiff and the other members of the Class acquired Qutoutiao's securities during the Class Period at artificially high prices and were damaged thereby.

100.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems

that Qutoutiao was experiencing, which were not disclosed by the Company and the Individual Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Qutoutiao securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

101.    By virtue of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

102.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT IV

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

103.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

104.    The Individual Defendants acted as controlling persons of Qutoutiao within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these

statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

105.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

106.    As set forth above, Qutoutiao and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  September 18, 2020

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

***Attorneys for Plaintiff***

**CERTIFICATION PURSUANT**
**TO FEDERAL SECURITIES LAWS**

1.    I, _Howard Brown_ , make this declaration pursuant to
Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities
Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of
1995.

2.    I have reviewed a Complaint against Qutoutiao Inc. ("Qutoutiao" or the "Company")
and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire Qutoutiao securities at the direction of plaintiffs' counsel or
in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who
purchased or otherwise acquired Qutoutiao securities during the class period, including providing
testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the
most adequate lead plaintiff in this action.

5.    To the best of my current knowledge, the attached sheet lists all of my transactions in
Qutoutiao securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have
not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the
class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs
and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury that the foregoing is true and correct.

Executed _____ $8 - 30 - 2020$ _____
                    **(Date)**


_____

**(Signature)**

Howard Brown

**(Type or Print Name)**

**Qutoutiao Inc. (QTT)**                                                    **Brown, Howard**

**List of Purchases and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 1/15/2019 | 1,066 | $8.9997 |
| Purchase | 1/15/2019 | 1,000 | $9.0000 |