UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re QUTOUTIAO, INC. SECURITIES LITIGATION

20-cv-6707 (SHS)

<u>OPINION & ORDER</u>

SIDNEY H. STEIN, U.S. District Judge.

I. Background ...................................................................................................................................2
   A. QTT............................................................................................................................................2
   B. Parties.......................................................................................................................................2
   C. Claims ......................................................................................................................................3
II. Discussion .....................................................................................................................................4
   A. 1934 Exchange Act Claims ....................................................................................................4
      1. Motion to Dismiss ...............................................................................................................4
      2. Standard of Review.............................................................................................................5
         a. Count I: Section 10(b) Claims Under the 1934 Exchange Act .................................5
            i. Misstatements or Omissions of Material Fact.......................................................5
               a) QTT's Strategy of Rapidly Growing Revenues Through Intentional Placement of Illegal Advertisements .....................................................................6
               b) QTT's Failure to Disclose Knowledge of Illicit Advertising as a Key Driver of Revenue Growth .....................................................................................................8
               c) QTT's Statements Regarding Screening of Illegal Advertisements................9
               d) QTT's Failure to Disclose Related-Party Transactions.................................11
                  1) Dianguan..........................................................................................................12
                  2) Mengtui, Fangce, and Shihui Miao................................................................13
               e) QTT's Inflation of Revenue for U.S. Filings....................................................13
               f) QTT's Failure to Disclose Contingent Liabilities ............................................14
         b. Count II: Section 20(a) Claims Under the 1934 Exchange Act ...............................15
   B. 1933 Securities Act Claims....................................................................................................15
      1. Standard of Review...........................................................................................................16
         a. Count III: Section 11 Claims..........................................................................................17
            i. Standing........................................................................................................................17
            ii. Analysis .......................................................................................................................18
         b. Count IV: Section 12(a)(2) Claim .................................................................................19
         c. Count V: Section 15 Claim .............................................................................................19
III. Conclusion..................................................................................................................................19

Lead Plaintiff James Pappas brought this securities class action against defendant Qutoutiao Inc. ("QTT"), a Chinese news-aggregation app, its directors and officers, and its corporate underwriters. In his Consolidated Amended Class Action Complaint ("the Complaint") Lead Plaintiff alleges claims under the Securities Act of 1933 and the Securities Exchange Act of 1934 relating to QTT's initial public offering ("IPO") and secondary public offering ("SPO").

QTT and one of its directors, Oliver Yucheng Chen, have moved for dismissal of the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim ("the QTT Motion"). Underwriter Defendants similarly moved for dismissal, joining the arguments set forth in the QTT Motion and asserting additional grounds.

For the reasons set forth below, the Court grants both motions.

## I. BACKGROUND

### A. QTT

QTT operates mobile platforms that distribute and share entertainment content in China. The QTT app aggregates articles and videos from content providers and presents customized feeds to app users. QTT generates the majority of its revenue through advertising. (Compl. ¶¶ 58, 61.)

On September 14, 2018, QTT announced its IPO of 12,000,000 American Depositary Shares ("ADS") at a price of $7 per share. In connection with the IPO, QTT filed with the Securities and Exchange Commission ("SEC") its third and final amendment to its previously filed—but not yet effective—registration statement on Form F-1 that took effect on September 13. On September 14, QTT filed its prospectus on Form 424B4 ("IPO Prospectus," and together with the IPO Registration Statement, the "IPO Offering Documents"). The IPO closed on September 18, 2018. (Compl. ¶ 62.)

On March 29, 2019, QTT announced an SPO of 10,000,000 QTT ADSs at a price of $10 per share. In connection with the SPO, QTT filed with the SEC its only amendment to the previously filed—but not yet effective—registration statement on Form F-1 that took effect on April 2. On April 3, QTT filed its prospectus on Form 424B4 (the "SPO Prospectus"). The SPO closed on April 5, 2019. (Compl. ¶ 64.)

QTT reported third quarter 2020 financials on December 16, 2020 that allegedly triggered a significant share price decline. (Compl. ¶ 90.) Consequently, Lead Plaintiff argues that the relevant class period for this action is between September 14, 2018 and December 16, 2020. (*Id.* ¶ 1.)

### B. Parties

Lead Plaintiff purchased QTT securities during the class period and alleges that he suffered damages arising from federal securities law violations. (Compl. ¶ 22.)

The Complaint names four classes of defendants. The first is QTT itself. The Complaint then lists four Insider Defendants: Eric Tan ("Tan"), the co-founder of QTT and the Company's Chief Executive Officer ("CEO") since May 20, 2019; Lei Li, the co-founder of QTT and director

2

and CEO of the Company until May 2019 ; Jingbo Wang, a director and QTT's Chief Financial Officer ("CFO") until January 22, 2020; and Xiaolu Zhu, the Company's CFO since January 22, 2020 (collectively, "the Insider Defendants"). (*Id.* ¶¶ 24-29.)

Next, the Complaint names six Director Defendants: Shaoqing Jiang, a director and a member of QTT's Audit Committee and Compensation Committee until September 2019; Jianfei Dong, at all relevant times a director and co-president; Oliver Yucheng Chen, at all relevant times a director and the Chief Strategy Officer from August 2018 to February 2020; Yongbo Dai, a director beginning in November 2018; James Jun Peng, at all relevant times a director of the company; and Feng Li, at all relevant times a director and a previous Chair of the Audit Committee (collectively, "the Director Defendants"). (*Id.* ¶¶ 30-35.)

Finally, the Complaint lists nine Underwriter Defendants: Citigroup Global Markets Inc.; Deutsche Bank Securities Inc.; China Merchants Securities (HK) Co., Ltd., a China-based company principally engaged in financial services; UBS Securities LLC; Keybanc Capital Markets, Inc.; CLSA Limited; Haitong International Securities Company Limited; Jefferies Group LLC; and Lighthouse Capital International Inc., also known as Guangyuan Capital or Guangyuan Ziben, a China-based company that operates as a boutique investment bank (collectively, "the UW Defendants"). (*Id.* ¶¶ 37-45.)

## C. Claims

Lead Plaintiff's claims arise out of the 1934 Exchange Act and the 1933 Securities Act. The 1934 Exchange Act claims pertain to QTT, the Insider Defendants, and the UW Defendants (collectively, the "1934 Exchange Act Defendants") (Compl. ¶ 53), and the 1933 Securities Act claims pertain to QTT, the Director Defendants, and the UW Defendants (collectively, the "1933 Securities Act Defendants") (Compl. ¶ 56).

Count I alleges that QTT, the Insider Defendants, and the UW Defendants committed securities fraud by violating Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. Count II alleges that the Insider Defendants are liable for securities fraud as controlling persons pursuant to Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a). Count III alleges that QTT, the Director Defendants, and the UW Defendants made materially false or misleading statements in violation of Section 11 of the 1933 Securities Act. Count IV alleges that QTT and the UW defendants violated Section 12(a)(2) of the Securities Act, which makes liable any person who offers a security by means of a "prospectus ... which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2). Finally, Count V alleges that Director Defendants violated Section 15 of the Securities Act, which makes "controlling persons" or entities jointly and severally liable for any violations of Sections 11 and 12 committed by those within their charge. 15 U.S.C. § 77o.

## II. DISCUSSION

### A. 1934 Exchange Act Claims

Lead Plaintiff pleads securities fraud-based claims under sections 10(b) and 20(a) of the 1934 Exchange Act and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, against the 1934 Exchange Act Defendants (Compl. ¶ 123), accusing them of knowingly or recklessly making materially false and misleading public statements and omissions. The Complaint contends that:

- Qutoutiao was not able to generate sufficient revenue to meet its revenue targets unless it allowed unqualified advertisers to advertise on the QTT App, which it accomplished by targeting consumers who lived in lower-tier Chinese cities;
- The true reason why QTT replaced its advertising agent, Baidu, with a related party, Dianguan, was to bypass Baidu's oversight of the content and quality of advertisements and thereby generate increased revenue from risky advertisements;
- QTT had created separate teams for 1) dealing with qualified advertisers, whose advertisements were largely compliant with applicable Chinese regulations and thus low risk, and 2) dealing with unqualified advertisers, and that the "high-risk" team (which was disbanded after an exposé by the China Central Television "CCTV" network) outsourced nearly all of its advertisement screening to contractors who conducted minimal due diligence on their clients;
- As a result, QTT would place risky advertisements on the QTT App whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or which were linked to illegal online gambling platforms;
- As a result, QTT faced increasing regulatory scrutiny and reputational harm;
- As a result, QTT's advertising revenue was reasonably likely to decline;
- QTT was reporting RMB 620 million more in revenue to the SEC than its subsidiaries did in aggregate to the Chinese government's State Administration for Market Regulation ("SAMR");
- As a result of the foregoing, defendants' positive statements about QTT's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

(Compl. ¶ 124.)

#### 1. Motion to Dismiss

In evaluating a motion to dismiss a complaint pursuant to Rule 12(b)(6), the Court must accept the truth of the facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff. *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir. 2006). A complaint should be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility

4

that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

Here, the Court "may consider 'any written instrument attached to [the Complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.'" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (quoting *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).

### 2. Standard of Review

A complaint alleging securities fraud is subject to two heightened pleading standards. First, the complaint must satisfy Rule 9(b), which requires that it "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).

#### a. Count I: Section 10(b) Claims Under the 1934 Exchange Act

To state a claim for securities fraud pursuant to Section 10(b) and Rule 10b-5, "a plaintiff must allege that [each] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016) (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 105). All elements are necessary. To be material within the meaning of Section 10(b), "the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014).

Defendants maintain that this count should be dismissed because 1) it fails to allege actionable misstatements or omissions, and 2) it inadequately alleges that defendants acted with scienter.

##### i. <u>Misstatements or Omissions of Material Fact</u>

A plaintiff may bring a claim pursuant to Section 10(b) and Rule 10b-5 based on either affirmative misstatements or omissions of material fact. "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why

5

the statements were fraudulent." *ATSI Commc'ns.*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)). A securities fraud complaint based on omissions must allege that "the corporation is subject to a duty to disclose the omitted facts." *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)). A corporation is "not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *Id.* (quoting *In re Time Warner*, 9 F.3d at 267).

Nevertheless, a "duty to disclose 'arises when disclosure is necessary to make prior statements not misleading.'" *Beleson v. Schwartz*, 599 F. Supp. 2d 519, 525 (S.D.N.Y. 2009) (quoting *In re Time Warner*, 9 F.3d at 268). "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014).

"'The test for whether a statement is materially misleading under Section 10(b)' is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004)). "[T]he lack of an independent duty is not … a defense to … liability because upon choosing to speak, one must speak truthfully about material issues." *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002).

The alleged misstatement or omission must also have been material. "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). "Because materiality is a mixed question of law and fact, in the context of a Fed. R. Civ. P. 12(b)(6) motion, 'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *Ganino*, 228 F.3d at 162).

Because the Court finds that the Complaint fails to adequately plead the first prong of the Section 10(b) standard—that defendants made misstatements or omissions of material fact— it declines to address the remaining requirements to state a Section 10(b) claim. The Court will address each of the alleged misstatements or omissions of material fact raised in the Complaint in turn.

> a) QTT's Strategy of Rapidly Growing Revenues Through Intentional Placement of Illegal Advertisements

Lead Plaintiff contends that "[c]entral to QTT's strategy of rapidly growing its revenues was the intentional placement of non-conforming, and, in many cases, illegal advertisements on its mobile applications." (Compl. ¶ 79.) The Complaint avers that QTT's "fraud was not disclosed to investors" (Compl. at 23) and that "QTT actively took steps to evade government regulations and encouraged the placement of illegal ads on its platform." (Compl. at 26.)

Specifically, Lead Plaintiff claims that "[d]efendants' statements about QTT's business model and success were misleading and actionable half-truths." (Plaintiff's Opp. at 15.)

6

The Complaint alleges that QTT's publicly stated reasons for acquiring advertising agent Dianguan were false or misleading because "the Company acquired an advertising agent [Dianguan] in February 2018 to reduce the oversight that Baidu had been providing which had prevented non-compliant ads from running." (Compl. ¶ 129.) Lead Plaintiff further urges that "other than eliminating oversight, the replacement of Baidu with Dianguan made no sense. Baidu was reputable, stable, and lucrative; Dianguan was a startup that had been formed just four months before its acquisition by QTT" and that "[d]efendants knew they could flood the QTT App with a continuous, profitable stream of illegal advertisements that Dianguan would not censor." (Plaintiff's Opp. at 7.)

QTT Defendants, however, note that SEC Form 20-F Annual Report for FY 2019 shows that "Qutoutiao made detailed disclosures regarding the business reasons for acquiring Dianguan, such as enhanced monetization efficiency and long-term business independency." (QTT Mot. at 13 & n.11.) QTT Defendants contend that "the Complaint includes no well-pleaded factual allegation that contradicts these disclosures." (*Id.*)

The QTT Defendants are correct. Plaintiff has not pled non-conclusory facts, if accepted as true, that would suggest that QTT's motivation for acquiring Dianguan was anything other than what QTT publicly disclosed in its SEC filings. Plaintiff has therefore failed to make an adequate showing that any of the defendants made a misstatement or omission of material fact regarding QTT's motivation for acquiring Dianguan.

The Complaint also states that QTT had "separate teams" for qualified versus unqualified advertisers, but its sole factual support for this allegation comes from a confidential witness (a former QTT Sales Director) who claims that during his fourteen months of employment in 2019-2020, there were two teams that "operated independently": one team worked with "well-known and qualified advertisers, who were largely compliant" and the second team "mainly dealt with unqualified advertisers whose advertisements were 'risky.'" (Compl. ¶ 81.) The former Sales Director says that he "did not deal with unqualified advertisers" and does not claim that he ever supervised any employees who dealt with unqualified advertisers. (*Id.*)

The Complaint lacks specificity in its factual assertion that the "second team was disbanded after the Company's practice of promoting illegal advertisements was exposed on Chinese state-TV in July 2020." (*Id.*) Although the Complaint states multiple times that QTT "disbanded" the second advertising team (*id.* ¶¶ 55, 124, 148, 157, 194, 206, 244, 260, 270), Lead Plaintiff's counsel could offer no factual support for this assertion at oral argument.

When asked at oral argument to point to specific allegations that QTT had developed a strategy to increase the placement of illegal ads, counsel for Lead Plaintiff responded that "it's part and parcel of the totality of the circumstances. There is no specific allegation that says, in this meeting, these defendants came together with a strategy …" (ECF No. 102, at 11.) Therein lies the problem. Claims arising under Section 10(b) cannot be supported by a mere "totality of the circumstances" argument; the Complaint must include facts supporting the allegation that there was a strategy to intentionally place illegal advertisements.

Because Lead Plaintiff has not stated with particularity the circumstances constituting fraud, the Complaint fails to state a Section 10(b) claim grounded in the assertion that QTT had

7

a strategy of rapidly growing revenue by intentionally placing illegal ads on its app and failed to disclose that strategy.

### b) QTT's Failure to Disclose Knowledge of Illicit Advertising as a Key Driver of Revenue Growth

Plaintiff also argues that "while publicly identifying specific factors that supposedly drove QTT's revenues, Defendants failed to disclose that illicit advertising was a key driver of the Company's increasing revenues." (Plaintiff's Opp. at 15.)

Specifically, the Complaint alleges that QTT's public statements contained in ¶¶ 128, 142, 144-147, 153, 163, 195, 202, 210-12, 214-15, 217-19, 245-46, 248-50 were "materially false and misleading" because any increase in advertising revenue "was primarily due to" or "due to" "the increase in ads whose claims could not be substantiated and thus were considered false advertisements under applicable regulations or provided links to illegal online gambling platforms." (Compl. ¶¶ 129, 143, 148, 154, 164, 196, 203, 213, 216, 220, 247, 251.)

The Complaint similarly contends that several statements (Compl. ¶¶ 138, 167, 188, 236) were false and misleading because "a material number of the Company's customers were unqualified advertisers who were purchasing non-compliant ads" (Compl. ¶¶ 139, 168, 237), without ever alleging, even approximately, how many of QTT's customers were unqualified advertisers or what portion of QTT's revenues were derived from such advertisers. Relatedly, the Complaint contends that "until December 2020, Defendants never disclosed to investors that a substantial amount of QTT's revenue was generated from illegal advertisements paid for by shady unqualified advertisers which did not comply with applicable Chinese regulations and that they were managing the risk of losing that revenue by reducing the chance of getting caught by state regulators by placing those advertisements in lower tier Chinese cities." (Compl. ¶ 93.)

The Complaint therefore avers that QTT (i) had full knowledge of the scale of illicit activity, (ii) knew that the illicit activity was a substantial share of QTT's revenues, and (iii) had a duty to disclose this fact but failed to do so.

However, the Complaint's factual assertions do not offer any indication as to the magnitude of the allegedly illicit advertising activity. For instance, although the Complaint seeks to rely on confidential witness accounts, these do not indicate that illegal advertising comprised any more than—at most—a nominal share of QTT's revenues. The Complaint cites to a November 28, 2018 CCTV claim that QTT violated advertising guidelines related to "vulgar content" and to a June 18, 2019 Shanghai Municipal Market Supervision Bureau ("Shanghai Regulator") preliminary investigation finding of "severely illegal advertisements" on QTT and related platforms. (Compl. ¶¶ 266, 269.) These public reports, as well as the other incidents cited by the Complaint, fail to support an inference that QTT would have had knowledge that illicit advertisements contributed to more than a nominal amount of QTT's revenue *prior to* the July 15, 2020 CCTV report. (*See* Compl. ¶ 88.)

When asked to clarify this point at oral argument, Lead Plaintiff's counsel cited the 20 percent revenue drop QTT suffered after the CCTV report regarding illegal advertisements was aired. However, this percentage does not represent the percentage of illegal advertisements

contributing to QTT's revenue. The Complaint provides no support for its assertion that "a substantial amount" of revenue came from illegal advertisements. Furthermore, Lead Plaintiff's counsel presented no information to contradict defense counsel's assertion that the revenue drop was due to QTT's significant remedial efforts after the CCTV reports aired and that in fact the illegal advertisements made up only a very small percentage of QTT's overall advertising. (ECF No. 102, at 3-7.)

All of the Complaint's related factual assertions are wholly conclusory. Because the Complaint does not plausibly allege that a significant share of QTT's advertising revenue was tied to illicit advertisements, the Complaint offers no support for the claim that the 1934 Exchange Act Defendants "failed to adequately warn investors that certain 'Risk Factors' had already materialized at the time of the IPO" (Compl. ¶ 135), the SPO (*id.* ¶ 166), the 2018 20-F annual report (*id.* ¶ 185), and the 2019 20-F annual report (*id.* ¶ 233).

The Complaint offers limited factual support for QTT's evolving knowledge of suspected illicit advertisements on its platform. Namely, the Complaint notes that by July 18, 2020, "228 complaints had been filed on Black Cat Complaints—a Chinese consumer rights protection group—regarding the proliferation of false advertisements on the QTT App." The Complaint offers no such data as to the number of complaints *prior* to the major CCTV report that could plausibly indicate greater QTT awareness of illicit advertisements on its platform prior to July 2020.

Because Lead Plaintiff does not adequately allege the scale of illicit advertising activity and does not sufficiently allege QTT's knowledge of illicit advertisements on its platform, the Complaint fails to state a Section 10(b) claim grounded in this factual assertion.

### c) QTT's Statements Regarding Screening of Illegal Advertisements

Plaintiff contends that "to further mislead investors about QTT's reliance on revenue from illegal advertisements, Defendants created the false impression that QTT successfully screened out illegal advertisements." (Plaintiff's Opp. at 15, citing Compl. ¶¶ 68, 130, 133, 136, 170, 181, 229.) Lead Plaintiff notes that this occurred both in QTT's SEC filings as well as through defendant Tan's statements. (*Id.* at 16.)

Lead Plaintiff's arguments here take two forms: first, that QTT actively misled investors on the nature of its screening technology to prevent illicit advertisements (which all parties agree were a risk to QTT) and second, that Tan made affirmative statements touting QTT's screening capacity while aware that QTT's controls were at the time of his statements ineffective at ensuring compliance with Chinese law.

Indeed, in QTT's IPO Offering Documents, its 2018 20-F, and its 2019 20-F, the Company states that "[w]e actively monitor the advertisements placed to help ensure their relevance." (Comp. ¶¶ 131, 179, 226.) Plaintiff urges that QTT held itself out as providing superb ability to screen out illicit advertisements, including through the use of proprietary "artificial intelligence" that could "monitor and identify objectionable visual content with a high degree of accuracy" and flag "suspicious content for manual review." (Compl. ¶ 13.)

9

However, as QTT Defendants observe, QTT's reference to "artificial intelligence" referred to QTT's core content to consumers, not to the advertisements that generated its revenue. "The disclosures Plaintiff attacks are not about *advertising* regulations at all—they relate to Qutoutiao's compliance with PRC regulations that govern *content*, such as news articles." (QTT Reply, ECF No. 62, at 1.)

Furthermore, even if QTT's statements led an investor to believe that the company manually reviewed each advertisement to ensure that there was zero risk of placing an illicit advertisement on its platform, QTT's disclosure documents leave no doubt that investors were warned of the risks. The IPO Offering Documents stated that "our employees responsible for reviewing advertisements may not fully understand the relevant laws and regulations or may be inappropriately influenced by the advertisers" and the 2018 20-F warned that "advertisers on our mobile applications, or their agents, may use measures that are designed to evade our monitoring, such as providing inauthentic material that does not match the actual advertisement . . . " (*See* Compl. ¶ 136, 186.) Elsewhere, QTT discloses that it "cannot assure you that all the advertisements shown on our mobile applications are true, accurate, appropriate and in full compliance with applicable laws and regulations." (*Id.*)

Finally, Lead Plaintiffs also cite to Tan's assertion on a September 5, 2019 financial earnings call that "[w]e have one of the best track records in compliance among all the sizeable newsfeed players in the space as we have put in significant efforts from the very beginning in building our content compliance teams and capabilities." (Compl. ¶ 205.)

Lead Plaintiff argues that Tan's statements were classically violative of the Second Circuit standard set forth in *Meyer v. Jinkosolar Holdings Co., Ltd.* 761 F.3d 245, 251 (2d Cir. 2014), in that they wrongly "gave comfort to investors that reasonably effective steps were being taken" even though QTT failed to disclose that its measures "were then failing to prevent substantial violations of the Chinese regulations." (Plaintiff's Opp. at 16.)

Yet for reasons substantially similar to those set forth above, Lead Plaintiff has not plausibly alleged that Tan or QTT had awareness as of September 5, 2019 that QTT was "then failing to prevent substantial violations of the Chinese regulations." Moreover, the Complaint does not offer factual pleadings to indicate that QTT's competitors had better "track records" in that regard.

The Complaint also alleges that Tan's statements in a 4Q18 Earnings Call that "the quality of our advertisers has consistently improved since we went public" were materially false or misleading. But this statement and its ilk are best construed as inactionable puffery. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 647 (S.D.N.Y. 2017).

Moreover, the Complaint mischaracterizes QTT's public statements to suggest that QTT somehow promised to "stop the Company from running non-compliant ads on advertisers' behalf in lower tier cities" (Compl. ¶ 157); in fact, as described above, QTT had repeatedly disclosed the risk that unlawful advertisements could appear on its platform.

The Complaint further alleges that Tan's September 22, 2020 statements on a 2Q20 Earnings Call, including that "we have already seen a trend of recovery and we are seeing the growth and recovery will continue in Q4" were materially false and misleading. (Compl. ¶¶ 255-56.) Specifically the Complaint alleges that "Tan continued to materially

10

misrepresent . . . the extent to which the CCTV Exposé would continue to impact the Company's business operations and financials." (Compl. ¶ 256.)

While Tan's assertion that "we are seeing the growth and recovery will continue in Q4" could suggest that the CCTV reports would not have had a major impact on QTT's financial performance, Tan immediately thereafter used far more cautionary language about his expectations, including that QTT is "still evaluating the extent of such impacts." (Compl. ¶ 257.) This cautionary language from Tan would preclude a reasonable investor from basing an investment decision on Tan's vague and highly optimistic statement that "we are seeing the growth and recovery will continue in Q4." (Compl. ¶ 255.)

Last, Tan's statement on the 2Q20 Earnings Call that "[w]e have always closely followed rules and regulations of the industry and the country" is best construed as inactionable puffery. *See Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) ("We have observed that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them.") This statement would not reasonably be seen as providing an investor with assurances that QTT had never engaged in conduct that might even unintentionally violate U.S. securities law or what the parties agree is China's complex and unpredictable enforcement regime.

Because the Complaint fails to adequately allege that QTT or Tan misled investors through its statements concerning internal QTT screening of content and advertisements, the Complaint fails to state a Section 10(b) claim grounded in this factual assertion.

### d) QTT's Failure to Disclose Related-Party Transactions

Lead Plaintiff also argues that defendants failed to disclose related-party transactions as required under Generally Accepted Accounting Principles ("GAAP") and SEC Regulation S-X (Compl. ¶¶ 102-3) and the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ACS") 850, (Compl. ¶ 104). Examples of related parties under FASB ASC 850 include:
- Affiliates of the entity.
- Principal owners of the entity and members of their immediate families; management of the entity and members of their immediate families.
- Other parties with which the entity may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests.
- Other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests.

Compl. ¶ 104 n.35 (quoting ASC 850-10-20).

Lead Plaintiff alleges that QTT made omissions of material facts in the IPO Prospectus, the SPO Prospectus, the 2018 20-F, and the 2019 20-F in regard to disclosing related-party

11

transactions. (Compl. ¶ 107.) First, plaintiff contends that because Dianguan's founder, Liang, had "a close business relationship with Tan (Compl. ¶ 109), QTT's acquisition of Dianguan was a related-party transaction that was not properly disclosed. (Compl. ¶¶ 107-10.) Second, Lead Plaintiff contends that "Defendants failed to disclose that Mengtui, Fangce, and Shihui Miao—advertisers who appear to generate about 30% of the advertisements on the QTT App—were related parties benefitting Defendant Tan." (Plaintiff's Opp. at 17, citing Compl. ¶¶ 112-15.) Lead Plaintiff contends that such disclosures were "material related-party transactions" that QTT was obligated to disclose.

The QTT IPO Prospectus, SPO Prospectus, 2018 20-F, and 2019 20-F each included a section entitled "Related Party Transactions," including a subsection labelled "Transactions with Companies Controlled by or Affiliated with Mr. Tan." (Compl. ¶ 107.) The below analysis first considers the claim regarding Dianguan, and then turns to the claims regarding Mengtui, Fangce, and Shihui Miao.

### 1) Dianguan

According to the Complaint, Xiang "Sean" Liang ("Liang") founded Dianguan a mere four months before QTT acquired it in February 2018 and was its director and legal representative at that time. (Compl. ¶ 108.) The Complaint argues that Dianguan "would have been prevented from 'fully pursuing its own separate interest'" (*id.* ¶ 111), on account of Tan's alleged ability to "significantly influence the management or operating policies of [Dianguan, through Tan's influence on Liang] . . . to the extent that [Dianguan] *might* be prevented from fully pursuing its own separate interests." (*Id.* ¶ 104 n.35, quoting ASC 850-10-20) (emphasis added).

The Complaint offers two factual assertions to support its contention that Liang was a related party at the time QTT acquired Dianguan. First, Liang was "the director of domestic investment in a company," which "was the executive partner of a company that Defendant Tan had been the majority investor in since February 26, 2018." Compl. ¶ 109 (noting Tan held 64.5% of equity in the Nantong WooFoo Jinxin Equity Investment Fund Partnership and that Liang was the director of domestic investment at Nantong WooFoo Jinxin Investment Management Co. Ltd.) Yet because QTT acquired Dianguan on February 2, 2018, *see* Qutoutiao Inc., Annual Report (Form 20-F), at F-8 (Apr. 11, 2019), Lead Plaintiff's factual assertion does not suggest that Tan's involvement with Nantong WooFoo Jinxin Equity Investment Fund Partnership (commencing February 26) preceded QTT's acquisition of Dianguan (on February 2).

Second, during 2016, Liang was the investment director of Shanghai Taiyun Investment Management Co. Ltd. ("Taiyun Capital"), a company in which Tan held 99% of the equity and Tan's sister held the remaining 1% equity interest. (Compl. ¶ 110.) Lead Plaintiff further notes that in July 2018 (months after the February 2018 acquisition of Dianguan), Tan held a position of "business consultant" for Taiyun Capital. (Compl. ¶ 110.) Last, Lead Plaintiff states that Tan's sister is listed as a legal representative and director of Taiyun Capital and that Liang is still listed as an investment assistant for Taiyun Capital on a Chinese website that tracks technology companies. (Compl. ¶ 110.) Taken together, Lead Plaintiff's factual assertions are designed to

imply that Tan (or his sister) has exercised some element of control over Liang from 2016 through at least QTT's acquisition of Dianguan in February 2018.

Although Lead Plaintiff has demonstrated a likelihood that "Liang had a close business relationship with Defendant Tan" (Compl. ¶ 109), he does not elaborate on how their "business relationship was so intertwined such that Dianguan would have been prevented from 'fully pursuing its own separate interests' and that disclosure would have 'shed light on revenues generated from transactions with Dianguan prior to its acquisition and the reasons for acquiring Dianguan and replacing Baidu.'" (Compl. ¶ 111.) Lead Plaintiff's suggestion that Tan has all-purpose control over Liang is quite speculative. The simple presence of a business relationship between Tan and Liang is insufficient to trigger a duty to disclose. *See Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 450–51 (S.D.N.Y. 2008).

Because the Complaint fails to adequately plead that the relationship between Dianguan and Tan was so intertwined that Dianguan might have been prevented from fully pursuing its own interests, it cannot support its contention that QTT failed to report its acquisition of Dianguan as a related-party transaction and thereby fails to state a Section 10(b) claim grounded in this factual assertion.

### 2) Mengtui, Fangce, and Shihui Miao

Plaintiff urges that QTT failed to disclose related-party transactions involving three advertisers: (i) one of QTT's top advertisers Mengtui, who has "the copyright and website operating licenses . . . held by Shanghai Tujin Network Technology Co. Ltd., (ii) Publisher Shanghai Fangce Network Technology Co. Ltd. ("Fangce"), and (iii) Shihui Miao, whose "website operating licenses and software authorship rights are owned by Shanghai Xihu Culture Communications Co. Ltd." (Compl. ¶¶ 112-14.)

Although defendants do not contest that QTT's transactions with Mengtui, Fangce, and Shihui Miao were related-party transactions, these transactions *were* disclosed in QTT's 2019 annual report—the first annual report after these alleged related-party transactions took place. (ECF No. 102, at 42.) Counsel for Lead Plaintiff cited no requirement that companies disclose related-party transactions in real time and the Court has found none.

For these reasons the Complaint fails to adequately plead that QTT did not disclose related-party transactions at the appropriate time and thereby fails to state a Section 10(b) claim grounded in this factual assertion.

### e) QTT's Inflation of Revenue for U.S. Filings

Lead Plaintiff contends that QTT's 2017 and 2018 consolidated revenues in its SEC filings are materially higher than the 2017 and 2018 revenues reported to SAMR. (Compl. ¶ 116.)

However, as the Complaint itself recognizes, "SAMR filings . . . employ different accounting principles than U.S. GAAP, so it is not uncommon to have differences between a company's SAMR and SEC filings." (Compl. ¶ 117.) Courts in this district have found that in these instances the plaintiff "must allege at least some fact to support that (1) the SEC figures, and not the [other] filings, are false, and (2) any variation is not attributable to variations in

13

reporting rules or accounting standards." *In re China Valves Tech. Sec. Litig.*, 2012 WL 4039852, at *6 (S.D.N.Y. Sept. 12, 2012).

Lead Plaintiff urges that the discrepancy between the Chinese and U.S. filings are *not* due to differences in Chinese and U.S. accounting standards and claims that QTT "does not appear to generate revenue outside of mainland China" and "le[ft] RMB 187.6 million (or 36% of the reported revenue) unaccounted for in 2017 and RMB 970.67 million (or 32% of the reported revenue) unaccounted for in 2018, respectively." (Compl. ¶ 120.)

The claim that QTT "does not appear to generate revenue outside of mainland China" is not a factual allegation. Because Lead Plaintiff alleges no facts to support a finding that the SEC figures, rather than the SAMR figures, are false, and does not allege sufficiently that any variation between the two is not simply attributable to conceded variations in accounting standards, the Complaint fails to state with particularity circumstances constituting fraud and thereby fails to state a Section 10(b) claim grounded in this factual assertion.

### f) QTT's Failure to Disclose Contingent Liabilities

The Complaint also alleges that QTT's failure to disclose a loss contingency in its financial reports violated GAAP, and thus was an actionable omission. The Complaint notes that GAAP defines a loss contingency as "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur," Compl. ¶ 121 (citing ASC 450-20-20), and argues that "[b]ecause there was 'at least a reasonable possibility' that fines and penalties may have [] incurred, GAAP required QTT to disclose the nature of the aforementioned loss contingency and provide '[a]n estimate of the possible loss or range of loss or a statement that such an estimate cannot be made' in the notes to its financial statements." Compl. ¶ 122 (citing 450-20-50-3-4).

However, the Complaint does not allege any actual government investigation that is likely to result in a material fine. Furthermore, the mere "potential for investigation does not give rise to a 'probability of impairment,' the standard the GAAP uses when determining whether disclosure is necessary." *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 577 (6th Cir. 2008)).

Lead Plaintiff responds that the contingent liability was required to be disclosed because "QTT was on notice that Chinese regulators were scrutinizing its misconduct." (Plaintiff's Opp. at 15 n.15.) However, regulatory scrutiny by itself does not automatically mandate that a subject company account for loss contingency in its financials (which could impliedly require it to disclose uncharged wrongful conduct). *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (under sections 11 and 12(a)(2) of the Securities Act, "companies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing'").

Because the Complaint does not allege the existence of any government investigation whatsoever that is likely to result in a material fine, the Complaint fails to state a Section 10(b) claim grounded in this factual assertion.

In sum, Lead Plaintiff's Complaint fails to allege a single misstatement or omission of material fact that could give rise to a Section 10(b) claim. Count I is therefore dismissed in its entirety.

### b. Count II: Section 20(a) Claims Under the 1934 Exchange Act

Section 20(a) of the Securities Exchange Act creates a cause of action against defendants alleged to have been "control persons" of those engaged in the primary securities fraud. That section provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

"To state a claim of control person liability under section 20(a), 'a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007)).

Because the Court has found that the Complaint did not adequately allege an actionable primary violation of Section 10(b), Count II must be dismissed.

## B. 1933 Securities Act Claims

Lead Plaintiff also asserts strict liability claims under sections 11, 12(a)(2), and 15 of the 1933 Securities Act against the 1933 Securities Act Defendants (Compl. ¶ 314) arising out of QTT's IPO and SPO (Compl. ¶¶ 315-17). Lead Plaintiff alleges that the IPO documents "contained multiple material misstatements regarding the Company's strategy of targeting users in lower tier cities in China" (*id.* ¶ 321), "omitted material facts necessary to make the statements made therein not misleading" (*id.* ¶ 322), failed to disclose related party transaction information "involving the Mengtui App, Fangce and the Shihui Miao App based on Tan's ownership stakes in Taiyun Capital, and Bige" and "Dianguan Acquisition . . . based on Liang's special relationship with Tan through companies in which Tan is a majority investor or owner, including Woofoo Equity and Taiyun Cap" (*id.* ¶ 336), and made "untrue statements of material facts and omitted material facts necessary" related to net revenue data and reasons for replacing the Company's third-party advertising agent, Baidu, with Dianguan (*id.* ¶ 339-340). Lead Plaintiff makes nearly identical allegations relating to the SPO Documents.

Sections 11, 12, and 15 of the Securities Act "impose liability on certain participants in a registered security offering when the publicly filed documents used during the offering contain material misstatements or omissions." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010). Section 11 applies to "registration statement[s]," Section 12 covers any

15

"prospectus or oral communication," and Section 15 imposes liability on individuals or entities that "control[] any person liable" under Sections 11 or 12. 15 U.S.C. § 77k(a), *l* (a)(2), *o*. Liability pursuant to Section 15 thus requires, as a preliminary matter, a demonstration of liability under either Section 11 or Section 12. *In re Morgan Stanley Info. Fund*, 592 F.3d at 358.

### 1. Standard of Review

In considering Section 11 and Section 12(a)(2) claims under the 1933 Securities Act, the Court must "'conduct a preliminary inquiry into whether plaintiffs' allegations are premised on fraud,' or merely on negligence, to determine the appropriate pleading standard." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (quoting *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011)).

Courts have offered varying guidance on a plaintiff's burden to differentiate a Section 11 Securities Act claim based in negligence from a fraud-based 1934 Exchange Act claim. The Second Circuit in *Rombach v. Chang* noted that a complaint's statement that a claim does not sound in fraud and therefore is not subject to the requirements of Rule 9(b) is simply not sufficient. 355 F.3d 164, 172 (2d Cir. 2004) (citing *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996) ("[Plaintiff] argues that it specifically disclaimed any allegations of fraud with respect to its Section 11 claims. These nominal efforts are unconvincing where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims levied at the Prospectus.")). A complaint's articulation of the basis for a negligence claim would help to differentiate a 1933 Securities Act claim from the 1934 Exchange Act claim. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 633 (S.D.N.Y. 2007); and *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 691 (S.D.N.Y. 2000). Compartmentalizing the fraud and non-fraud claims can also be a factor in distinguishing a 1933 Securities Act claim from any fraud-based claims. *In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 14CV9826, 2017 WL 95176, at *3 (S.D.N.Y. Jan. 10, 2017) ("Plaintiffs have sufficiently compartmentalized the claims into two discrete theories—negligence under the Securities Act, and fraud under the Exchange Act, with specified factual allegations supporting each.... Accordingly, the notice-pleading standard of Rule 8 applies to Plaintiffs' Securities Act claims.").

Here the Complaint attempts to differentiate the 1934 Exchange Act fraud claims from the 1933 Securities Act claims and disclaims a theory of fraud for its 1933 Securities Act claims ("Lead Plaintiff expressly disclaims any reference or reliance upon fraud allegations for such claims and these claims are entirely separate and distinct from the 1934 Act Claims."). (Compl. ¶ 314.) The Court recognizes that although the Complaint's 1933 Securities Act arguments (Compl. § XI) center on statements that the Complaint had earlier alleged were made fraudulently (Compl. § VII), plaintiffs *can* use the same factual circumstances to plead Section 11 and Section 10(b) claims in the alternative. *See In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 116 (S.D.N.Y. 2010).

However, the Complaint's 1933 Securities Act arguments manifestly sound in fraud and thereby trigger the heightened Rule 9(b) pleading standard. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014). And the Complaint's disclaimer of fraud cannot by itself avoid the requirements of Rule 9(b). *See In re JP Morgan Chase Sec. Litig.*,

363 F. Supp. 2d at 635.); *see also In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 530 (S.D.N.Y. 2005). The language used throughout the 1933 Securities Act section of the Complaint in many instances mirrors exactly the language used throughout the section on the 1934 Exchange Act claims.

In an early section of the Complaint labeled "Defendant's Illegal Acts," which comes before any breakdown between the 1934 Exchange Act claims and 1933 Securities Act claims, Lead Plaintiff refers to the "fraud set forth in the Company's Offering Documents" and claims that "[c]entral to QTT's strategy of rapidly growing its revenues was the intentional placement of non-conforming, and, in many cases, illegal advertisements on its mobile applications." (Compl. ¶¶ 66, 79.) The Complaint alleges that QTT's IPO and SPO statements on revenue "contained multiple material misstatements regarding the Company's *strategy of targeting users* in lower tier cities in China" and "contained untrue statements of material facts and omitted material facts necessary to make the statements made therein not misleading by . . . [not] disclosing that the Company was seeking to avoid the oversight Baidu had been providing which had prevented non-compliant ads from running; . . .and [] describing the Company's 'performance obligation' to its end advertiser customers without disclosing that it set up separate teams with different processes and procedures for qualified versus unqualified advertisers in order to sell non-compliant and illegal ads." (Compl. ¶¶ 321, 324, 339, 340.)

The Complaint uses a similar "avoid the oversight" assertion for the IPO's and SPO's disclosures of risk (*id.* ¶¶ 333-34, 344-45). It alleges that "different processes and procedures were being applied to advertising content such that any declined ads could be manually allowed on the QTT app." (Compl. ¶ 329.) These claims simply do not sound in negligence. Thus, "[n]otwithstanding the Plaintiffs' fraud disclaimer, the Section 11 claims in this case are peppered with" language "classically associated with fraud." *In re Elan Corp.*, No. 02CIV.865(RMB)(FM), 2004 WL 1305845, at *7 (S.D.N.Y. May 18, 2004).

Because the Complaint's 1933 Securities Act claims sound in fraud, they are subject to the Rule 9(b) heightened pleading standards.

    *a.  Count III: Section 11 Claims*

        i.  Standing

QTT Defendants argue that Lead Plaintiff "lacks standing to bring a Section 11 claim with regard to the SPO. . . . [because] he cannot trace his shares to the SPO" and that he "lacks standing to assert the Section 12(a)(2) claim, for either himself or the putative class" because Lead Plaintiff had not "purchased the security directly from the defendants through the public offering at issue." (QTT Mot., at 23-24.) This argument is unpersuasive.

The Complaint states that Lead Plaintiff did not buy ADSs in the IPO or SPO directly from defendants, but that "his own personal claims mean that he 'possess[es] the same interest and suffered the same injury' as those class members who bought directly from Defendants" and that Lead Plaintiff "has 'the same necessary stake in litigating' the falsity of Defendants statements, and this therefore 'gives the named plaintiff a sufficient stake in the outcome of her putative class members' cases' to assert these claims." (Compl. n.79) (citing *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 94 (2d Cir. 2018)).

Lead Plaintiff persuasively contends that "*Langan* demonstrates that Mr. Pappas—who clearly has standing to bring Exchange Act claims, as well as § 11 claims as to the IPO—also has standing to bring the remaining Securities Act claims involving substantially the same materially false and misleading statements" (Plaintiff's Opp. at 43.) Lead Plaintiff argues that (i) "Plaintiff has alleged an injury caused by Defendants, as their conduct caused monetary losses capable of redress under §§ 10(b) and 20(a) of the Exchange Act and §§ 11 and 15 of the Securities Act (as to the IPO)" (Plaintiff's Opp. at 43); (ii) "the alleged injury is of the same general character as the injuries Defendants caused under § 12(a)(1) (as to the IPO and SPO) and § 11 (as to the SPO)" because "Plaintiff and the absent class members suffered monetary losses in connection with substantially similar false and misleading statements and omissions in Defendants' Offering Documents" (Plaintiff's Opp. at 43); and (iii) "Plaintiff and the absent class members have the same necessary stake to litigate those issues against Defendants [and] Plaintiff intends to prove that Defendants' statements were false and misleading and to recover on behalf of himself and the Class" (citing Compl. ¶¶ 310-12).

        ii.    Analysis

Section 11 prohibits materially false or misleading statements or omissions in registration statements, and requires a plaintiff to show (1) that it purchased a registered security, (2) the defendant participated in the offering in a manner sufficient to give rise to liability under Section 11, and (3) the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *In re Morgan Stanley Info. Fund*, 592 F.3d at 358–59; *In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 43 (2d Cir. 2006).

"'Issuers are subject to virtually absolute liability under section 11,' and plaintiffs alleging violations of Sections 11 and 12(a)(2) not need plead 'scienter, reliance, or loss causation.'" *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011) (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010)). Non-issuer "potential defendants under sections 11 and 12(a)(2) may be held liable for mere negligence." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359.

The definition of "materiality" for a Section 11 claim is identical to the definition for a Section 10(b) claim under the 1934 Exchange Act. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347 at 360.

As explained above, Lead Plaintiff's 1933 Securities Act claims under Section 11 sound in fraud as to QTT, the Director Defendants, and the UW Defendants and therefore are subject to the heightened pleading standard of Rule 9(b) and the PSLRA. Perhaps because the Complaint expressly disclaims that "liability under this Count arises from any scienter or fraudulent intent" (Compl. ¶ 373), it fails to plead facts with particularity as to each defendant. (Compl. § XI.) Accordingly, Lead Plaintiff's Section 11 claims under the 1933 Securities Act cannot survive QTT Defendants' motion to dismiss.

### b. Count IV: Section 12(a)(2) Claim

Sections 11 and 12(a)(2) are "Securities Act siblings" with "roughly parallel elements." *In re Morgan Stanley Info. Fund*, 592 F.3d at 359. Section 12(a)(2) prohibits materially untrue or misleading statements or omissions in any prospectus or oral communication used to solicit the sale of a registered security and requires a plaintiff to establish that (1) the defendant is a "seller" as defined by Section 12, (2) the sale was effectuated "by means of a prospectus or oral communication," and (3) the prospectus or oral communication "include[d] an untrue statement of material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l (a)(2); *In re Morgan Stanley Info. Fund*, 592 F.3d at 359.

Lead Plaintiff's claim alleging Section 12(a)(2) violations under the 1933 Securities Act must be dismissed for the same reasons set forth above regarding the Section 11 claims. This claim also concerns QTT's offering documents and sounds in fraud, but fails to plead facts with particularity as to each defendant. (Compl. § XI.) Accordingly, Lead Plaintiff's Section 12(a)(2) claims under the 1933 Securities Act must be dismissed.

### c. Count V: Section 15 Claim

In order to establish a prima facie case of controlling-person liability a plaintiff "must show a primary violation by the controlled person." *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996). "Section 15 requires only that a plaintiff plead that the relevant defendant controlled the primary violator, and control for purposes of Section 15 entails only "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 595 (S.D.N.Y. 2010) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996)).

Because Lead Plaintiff's Section 11 and Section 12(a)(2) claims for primary liability under the 1933 Securities Act fail, the Section 15 control person claims must be dismissed. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010); *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450 at 1472–73. ("In order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person.").

### III. CONCLUSION

For the reasons set forth above, defendants' motions to dismiss the Consolidated Amended Class Action Complaint are granted in full.

Dated: New York, New York
August 3, 2023

SO ORDERED:

Sidney H. Stein, U.S.D.J.